**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KATHRYN MARTONE,** | |
| **Plaintiff,** | **Civil Action No. 2:19-cv-21011** |
| **v.** | |
| **JET AVIATION FLIGHT SERVICES, INC.,** | **JURY TRIAL DEMANDED** |
| **RUSSELL OKRENT,** | |
| **LEON BLACK** | |
| **and** | |
| **DEBRA BLACK,** | |
| **Defendants.** | |

## <u>AMENDED COMPLAINT AND JURY DEMAND</u>

Plaintiff Kathryn Martone, by and through her attorneys, Bell & Bell LLP, hereby files the following Amended Complaint and Jury Demand ("Complaint").

## <u>PRELIMINARY STATEMENT</u>

1. This is an action for an award of damages and other relief on behalf of Plaintiff Kathryn Martone ("Plaintiff" or "Ms. Martone"), who was formerly employed by Defendant Jet Aviation Flight Services, Inc. ("Jet Aviation" or the "Company"). Ms. Martone was discriminated against and harassed on the basis of her sex, and was retaliated against and wrongfully terminated from her employment after she complained to her supervisors and to Human Resources about the discrimination and harassment, and for complaining about operational workplace safety and unsafe work conditions including those being caused by

another employee, Defendant Russell Okrent ("Mr. Okrent").[1] Ms. Martone has suffered

significant damages as a result of the conduct complained of herein.

2.	This action arises under the New Jersey Conscientious Employee Protection Act,

N.J.S.A. 34:19-1 et seq. ("CEPA"), Title VII of the Civil Rights Act of 1964, as amended by the

Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII"), and the New Jersey Law

Against Discrimination, N.J.S.A. 10:5-1, et seq. ("NJLAD").

<u>**JURISDICTIONAL STATEMENT**</u>

3.	This Court has original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.[2]

4.	The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4),

which grants the District Court original jurisdiction in any civil action authorized by law to be

commenced by any person to recover damages to secure equitable or other relief under any act of

Congress providing for the protection of civil rights.

5.	The amount in controversy in this matter exceeds the jurisdictional minimum

exclusive of interest and costs.

---

[1] On October 25, 2019, Ms. Martone filed a retaliation complaint with the Occupational Safety and Health Administration ("OSHA").

[2] This matter was initial filed pursuant to diversity jurisdiction. With the addition of the Title VII claim, this Court has original jurisdiction. Even absent the addition of the Title VII claim, however, this Court would continue to have diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The Parties hereto are citizens and/or residents of different states. Plaintiff Kathryn Martone is a citizen and resident of the Commonwealth of Pennsylvania. Defendant Jet Aviation is a Maryland corporation with a principal place of business in the State of New Jersey. Defendant Russell Okrent is a resident of the State of New Jersey. Defendants Leon and Debra Black are residents of the State of New York.

6.     This Court has supplemental jurisdiction over any New Jersey state law claims pursuant to 28 U.S.C. § 1367.

7.     All conditions precedent to the institution of this suit have been fulfilled.  On December 3, 2019, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  On July 27, 2020, the EEOC issued a Notice of Right to Sue to Plaintiff.  This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.  With respect to the NJLAD and CEPA claims herein, Plaintiff was not required to exhaust administrative remedies prior to filing those claims in Court and at the time of her initial Complaint filing in this matter it had been less than one year since the adverse actions complained of herein.

**PARTIES AND VENUE**

8.     This action properly lies in the District of New Jersey, pursuant to 28 U.S.C. § 1391(b).

9.     This action properly lies in the District of New Jersey because significant activities associated with the claim occurred in this district.

10.    Plaintiff Kathryn Martone is an adult female individual and citizen of Pocono Pines, Pennsylvania, and the United States of America.

11.    Defendant Jet Aviation was and is a Maryland corporation duly organized and existing under state law, with a business address and principal place of business at 133 Charles Lindbergh Drive, Teterboro, New Jersey 07608.

12.    Defendant Russell Okrent ("Mr. Okrent") is an adult male individual and resident of Short Hills, New Jersey, and the United States of America.

13.    Mr. Okrent is a pilot and employee of Defendant Jet Aviation.

3

14. Defendants Leon and Debra Black are adult individuals and residents of New York, New York, and the United States of America.

15. Defendants Leon and Debra Black are the owners of the aircraft on which Ms. Martone was employed.

16. Defendants Leon and Debra Black hired Jet Aviation to provide services relating to their aircraft on which Ms. Martone was employed and performed her work.

17. Defendants Leon and Debra Black had full decision-making authority with respect to Ms. Martone's hiring and firing.

18. Defendants Leon and Debra Black interviewed Ms. Martone prior to her being hired.

19. Defendants Leon and Debra Black were decision-makers with respect to, among other things, the hiring and firing of employees with respect to the crew of their aircraft, and thus, along with Defendant Jet Aviation, were Ms. Martone's co-employers.

20. At all relevant times, employees of Defendants Jet Aviation and Leon and Debra Black acted as agents and servants for Defendants Jet Aviation and Leon and Debra Black.

21. At all relevant times, employees of Defendants Jet Aviation and Leon and Debra Black were acting within the scope of their authority and in the course of employment under the direct control of Defendants Jet Aviation and Leon and Debra Black.

22. At all relevant times, Defendants Jet Aviation and Leon and Debra Black are and have been employers employing more than 15 employees.

23. At all relevant times, Defendants Jet Aviation and Leon and Debra Black are and have been employers as defined under the laws at issue in this suit and are accordingly subject to the provisions of said laws.

24. At all relevant times, Ms. Martone was an employee as defined in the laws at issue in this suit and is accordingly entitled to the protections of said laws.

**FACTS**

25. Jet Aviation, a subsidiary of General Dynamics, provides private jet charter services.

26. Jet Aviation was retained by Defendants Leon and Debra Black (collectively, the "Blacks") to provide jet charter services for a Gulfsteam 650 business jet airplane (the "aircraft") owned by the Blacks.

27. Ms. Martone was hired by Jet Aviation and the Blacks in or about May 2018 as a Cabin Safety Attendant.

28. Upon her hire, Lead Captain Chris Mihok ("Mr. Mihok") assured Ms. Martone that he wanted her to succeed and that the rest of the "team" would all be there to help her.

29. As a Cabin Safety Attendant, Ms. Martone worked with the crew to ensure passenger safety and comfort on flights.

30. Ms. Martone's crew consisted of herself and three (3) pilots, all of whom were male.

31. Ms. Martone excelled in her position as a Cabin Safety Attendant, performing her duties in a professional and exemplary manner.

32. In performing her duties as a Cabin Safety Attendant, Ms. Martone received substantial praise from crew and clients.

33. Ms. Martone has been thanked for her support on the aircraft by the account manager and has been informed numerous times by Lead Captain Chris Mihok that she was doing a great job.

34. Ms. Martone has never received any negative evaluation or criticism of her job performance.

35. Despite her exemplary job performance, throughout her employment with Jet Aviation and the Blacks, and particularly, in working with the all-male staff, Ms. Martone was consistently treated differently, yelled at, verbally abused, and disrespected on the basis of her sex.

36. The other members of Ms. Martone's team, who were all male, were not treated in the same negative, abusive and disrespectful manner that Ms. Martone was treated.

37. Specifically, Defendant Russell Okrent, a Company pilot on Ms. Martone's team, consistently singled out Ms. Martone for verbal abuse and harassment on a daily basis.

38. Despite the Company's claim that the crew was a "team" and were to work together as a team, it was apparent that Ms. Martone, the sole female, was treated differently than the male team members.

39. Ms. Martone was persistently belittled and subjected to scorn by the male members of her team. After Ms. Martone complained about this conduct, and specifically about sexual discrimination and harassment, this treatment grew worse until Ms. Martone was eventually fired.

40. More specifically, Ms. Martone was yelled at, verbally abused, and disrespected by her male co-workers and supervisors, while male employees were not subjected to similar treatment.

41. Ms. Martone was also subjected to highly inappropriate comments, many of which were of a graphic sexual nature, and these comments worsened over time during Ms. Martone's employment with Defendants.

42. Mr. Okrent told jokes and negative about women on a consistent and regular basis regarding what a woman's "proper place" was. These jokes and negative comments typically

began with Mr. Okrent commenting on his own wife, but then steering the conversation to generalized conversations about his stereotypical beliefs about a woman's "proper place."

43. Mr. Okrent frequently commented that older, specifically female flight attendants were "useless."

44. The male crew, including Mr. Mihok and Mr. Okrent, would make the comment, "I feel like I was rode hard and put away wet", after almost every long flight. Mr. Mihok and Mr. Okrent made clear by their mannerisms and tone while making this comment that it was meant to be of a sexual nature. Ms. Martone specifically objected about this comment to Mr. Mihok, in front of Mr. Okrent, explaining that she knew that they were not referring to horses when making the comment. Mr. Okrent told Ms. Martone to "chill out."

45. Whenever Ms. Martone used her index finger and thumb to reference a small amount of something, for instance to communicate a small amount in a foreign country, Mr. Mihok told her, "you can't do that in front of a man, we are sensitive to size."

46. The sexual comments described herein made by the male crew, including Mr. Mihok and Mr. Okrent, were frequently made in the crew van during trips between hotel and airport or vice versa, and Ms. Martone was a captive audience to these comments.

47. These comments were made on every, or nearly every trip that Ms. Martone worked on and thus occurred regularly.

48. In addition to the numerous instances of harassment and discrimination on the basis of her sex, Ms. Martone consistently sought and requested proper operational safety procedures and protocols for the safety of the passengers and crew, but which were ignored or dismissed with scorn and annoyance by Mr. Okrent.

49. Ms. Martone was appointed to be the Safety Representative for the Blacks' aircraft

by Matt Feinstein, Jet Aviation TEB Safety Officer.

50. Since her first trip and the beginning of her employment with Jet Aviation, Ms. Martone asked for "crew briefings" from the pilots with whom she worked on the aircraft.

51. The Flight Operations Manual section 5.3.3 states what information should be reviewed for the entire aircraft team and included items intended to ensure crew and passenger safety.

52. These crew briefings were intended to ensure crew and passenger safety and to help the pilots understand the desired sequence of events and actions, as well as the condition of the aircraft and any special hazards or circumstances involved in the planned flight sequence.

53. Despite Ms. Martone's numerous requests, the pilots frequently failed and/or refused to provide the requested crew briefings.

54. Ms. Martone also frequently requested weather/turbulence prediction reports from the pilots.

55. In response to her requests for weather/turbulence prediction reports, Ms. Martone typically received little to no response regarding her requests.

56. Moreover, when Ms. Martone requested weather reports and Mr. Okrent was on board, he would generally respond by laughing, sighing, or making inappropriate comments.

57. On one occasion, upon Ms. Martone's request for the weather report, Mr. Okrent replied, "I don't know and I don't care."

58. Mr. Okrent further stated that he "didn't even look at it."

59. The weather/turbulence prediction reports and crew briefings were integral to the safety of the crew and passengers, and the ongoing failure to provide the reports and crew briefings put passenger and crew safety at risk.

60. Ms. Martone believed that Defendants were either in violation of a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare as a result of the repeated failure to provide the crew briefings and weather/turbulence prediction reports despite her repeated and vocal requests.

61. Mr. Okrent's blatant lack of interest in aviation safety was of significant concern to Ms. Martone, and she brought her concerns to the attention of Lead Captain Chris Mihok.

62. In response, Mr. Mihok noted that Mr. Okrent apologized, and brusquely asked Ms. Martone, "what more do you want," thus implying that her valid safety concerns and requests to follow proper procedures were unimportant and bothersome.

63. Mr. Okrent also made other demeaning comments aimed toward belittling Ms. Martone and indicating that Ms. Martone's concerns for flight safety were annoying and bothersome.

64. For example, on August 15, 2019, Ms. Martone messaged Mr. Mihok regarding a flight in which Mr. Okrent turned off all the cabin power and lights during the flight, which created a potential safety hazard.

65. When Ms. Martone inquired what had happened with regard to the loss of power and lights, Mr. Okrent responded shortly, "I pushed a wrong button, leave me alone."

66. In another instance of discrimination, harassment, and lack of team communications regarding expectations and protocol, on another trip, Mr. Okrent screamed at Ms. Martone because his lunch had not arrived, wrongfully blaming her for his missing lunch. Ms. Martone texted Mr. Mihok regarding crew expectations of catering, to avoid such issues in the future.

67. Ms. Martone further stated to Mr. Mihok, and to crew member Ben Robertson, that,

as part of the crew, she should be kept informed of all information and developments relating to a flight, including when part of the crew is at the plane while on a trip, which was standard procedure. She received no response.

68. Ms. Martone engaged in protected activity by repeatedly complaining of unsafe working conditions and violation of orders, regulations, and/or standards of the Federal Aviation Administration (FAA) and/or other provisions of Federal law relating to air carrier safety. Ms. Martone complained to Defendants about the pilots failing and/or refusing to check weather reports prior to takeoff. FAA regulations and standards mandate preflight checklist, including current and predicted weather forecasts as part of the risk management process for identifying and mitigating hazards and assessing the consequences and benefits of the accepted risk

69. Due to the constant harassment, discrimination, verbal abuse and failure to take her concerns about safety seriously, Ms. Martone reported to Mr. Mihok the unfair, discriminatory and harassing treatment, her concerns about safety issues, and to request that she be treated respectfully and as part of the team.

70. Ms. Martone specifically complained to Mr. Mihok regarding sex discrimination and harassment described herein, and specifically complained about her concern that Defendants were either in violation of a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare as a result of the failure to provide weather/turbulence reports and crew briefings.

71. Mr. Mihok ignored Ms. Martone's complaints about discrimination, harassment and her concerns about safety issues, and told Ms. Martone to "let it go" regarding the concerns she had raised with him.

10

72.     Despite her complaints to Mr. Mihok, the team continued to harass, belittle and discriminate against Ms. Martone on the basis of her sex, and to dismiss her valid safety concerns and attempts to follow regulation and procedure.

73.     Accordingly, on August 23, 2019, Ms. Martone reported her concerns to a new supervisor, Cabin Attendant Supervisor Dani Mickel.

74.     Ms. Martone complained specifically to Ms. Mickel regarding the discrimination and harassment she was experiencing as a result of her sex, including the inappropriate sexual jokes and comments made by Mr. Okrent, Mr. Mihok and other male employees, and complained to Ms. Mickel regarding her concerns that Defendants were either in violation of a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare as a result of the failure to provide weather/turbulence reports and crew briefings.

75.     In response, however, similar to the responses she had received from Mr. Mihok, Ms. Mickel marginalized Ms. Martone's concerns and made an excuse for each incident of discrimination, harassment, and Mr. Okrent's dismissal of her attempts to ensure proper safety in the aircraft.

76.     Ms. Mickel told Ms. Martone regarding her concerns about discrimination, harassment, hostile work environment and workplace safety, to "let it go."

77.     Ms. Martone thereafter contacted Courtney Mazzola of Human Resources, specifically noting that she had expressed her issues and concerns to both Mr. Mihok and Ms. Mickel, but that neither had done anything in response to Ms. Martone's reported concerns and issues. Ms. Martone specifically complained about discrimination and harassment on the basis of her sex, and specifically complained that she believed that Defendants were either in violation of

a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare as a result of the failure to provide weather/turbulence reports and crew briefings.

78. Ms. Martone also requested a meeting with all the pilots to discuss her issues. This requested meeting never happened.

79. Notwithstanding the ongoing harassment and discrimination, ongoing unaddressed safety issues, and complete failure of the Company to respond appropriately to Ms. Martone's complaints, Ms. Martone continued to perform her duties in an excellent manner, while seeking ways to improve the communication and teamwork between her and her team.

80. For example, on September 6, 2019, Ms. Martone sent an email to all three pilots on her crew, officially requesting the crew briefings citing the Flight Operations manual section 5.3.3, and stating as follows: "Hey guys, going forward on all trips I would like to have full crew briefing at some point during our [pre-departure] duties as it states in our Flight Operation Manual. (section 5.3.3). Its really important to me for good [crew resource management], as well as being important to the safety of the passengers and all crew."

81. On her next trip, on September 14, 2019, Ms. Martone discovered that the aircraft was broken, which would delay their departure. She also learned that all the male members of her team had known of the broken aircraft and several days' delay, but had not informed her.

82. Again, in seeking to encourage better communication, crew resource management and teamwork, Ms. Martone again requested that the other members of the team keep her informed as to relevant information and changes taking place.

83. On the following trip, on September 17, 2019, Ms. Martone was walking towards the elevators after checking into the hotel when she was pulled aside by Mr. Okrent, who informed her that he needed to speak with her.

84. Another member of their team, pilot Ben Robertson, was nearby and witnessed the entire interaction.

85. Mr. Okrent began by mocking Ms. Martone in referring to the crew briefing, which was to be attended by all crew, as a "flight attendant briefing" to be given only to Ms. Martone.

86. Ms. Okrent then told Ms. Martone that he did not appreciate that she had contacted the Company and Human Resources to report her issues about him.

87. Ms. Martone responded that she had attempted to speak directly with Mr. Okrent, as well as Mr. Mihok, on numerous occasions, but was either ignored or received rude and disrespectful comments in response.

88. Ms. Martone further told Mr. Okrent that she had requested a meeting with the Company to discuss their issues, and that they should discuss these issues, including Mr. Okrent's feelings regarding her complaints, at that meeting.

89. Mr. Okrent ignored Ms. Martone's request and repeated that Ms. Martone did not have any right to contact Human Resources about him.

90. When Ms. Martone indicated that Mr. Okrent had been rude and disrespectful to her, particularly with respect to her requests for weather reports, Mr. Okrent again ignored her statement and criticized Ms. Martone for allegedly failing to keep the baggage compartment neat.

91. Ms. Martone responded that they were supposed to be a team, that she was part of that team which did not only include the three male pilots, and that she had repeatedly sought a

safe environment and crew resource management, but that Mr. Okrent had been an impediment to both.

92. This hostile confrontation initiated and prolonged by Mr. Okrent continued until the hotel manager approached them to request that they "take their conversation elsewhere."

93. Ms. Martone extricated herself to go to her room, where she texted Mr. Okrent to confirm that she would no longer have such conversations with him on any trip, that they could only have operational or professional conversations, and that such conversations regarding his issues should only take place at the upcoming meeting.

94. Ms. Martone also immediately contacted Human Resources regarding Mr. Okrent's inappropriate harassment and verbal abuse in the hotel lobby.

95. Among other things, Ms. Martone noted that Mr. Okrent's actions must be taken seriously, as they were against safety regulations.

96. Ms. Martone further noted to Human Resources that she had been complaining for months about sex discrimination, sex harassment and violations of what she believed to be laws and regulations or safety issues, but the Company had failed and/or refused to respond in any meaningful way to Ms. Martone's complaints or to Mr. Okrent's acts of harassment, discrimination, and violations of and indifference to workplace safety and violations of workplace safety standards.

97. Ms. Martone specifically complained to Human Resources that she had been discriminated against and harassed on the basis of her sex and that she believed that Defendants were either in violation of a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare as a result of the failure to provide weather/turbulence reports and crew briefings.

98.     Later that day, Ms. Martone's supervisor escorted her upstairs to meet with Human Resources Representative Courtney Mazzola and an account manager.

99.     At this meeting, Ms. Martone was informed that she was being "grounded" for "aggressive behavior," as reported by a pilot, referring to her interaction with Mr. Okrent earlier that day.

100.     Ms. Martone attempted to explain the reality of the situation, including that, despite her repeatedly stating that their issues should be discussed at a proper meeting, Mr. Okrent had cornered her for purposes of harassment and verbal abuse because he was upset she had spoken to the Company about her concerns and issues with him.

101.     Ms. Mazzola ignored Ms. Martone's version of the incident and informed Ms. Martone that she would not be on the next trip and that she was not to contact the Blacks personally regarding her situation.

102.     Ms. Martone inquired whether Mr. Okrent was also grounded during the Company's investigation, and she was told that he was.

103.     Notably, on September 5, 2019, significantly prior to her interaction with Mr. Okrent on September 17, but after Ms. Martone had made repeated complaints, Ms. Martone learned that she had been removed from the schedule for a trip that had been scheduled for September 8, 2019.

104.     After the meeting on September 17, 2019 in which Ms. Martone was told that she was being grounded, Ms. Martone emailed Ms. Mazzola a detailed version of her account of what had transpired between herself and Mr. Okrent at the hotel on September 17. Ms. Martone also sent to Ms. Mazzola the text she had sent to Mr. Okrent immediately following their exchange,

noting that she wanted this situation to be taken seriously, as Mr. Okrent's actions had been against the Company's harassment and safety policies.

105. Ms. Martone was thereafter removed from the work schedule.

106. Ms. Martone learned that a contract flight attendant had been assigned to her plane, and that the contract flight attendant had been directed not to contact or communicate with Ms. Martone.

107. Ms. Martone also discovered that the Company had not grounded Mr. Okrent, as it had done to her and said that it had done to Mr. Okrent, but that, in fact, the Company was still permitting Mr. Okrent to fly other aircraft.

108. On September 21, 2019, Ms. Martone emailed Ms. Mazzola, asking why she was still grounded and had been taken entirely off the schedule, while Mr. Okrent had several upcoming trips. Ms. Martone also questioned why she was being held to a different standard and treated differently than Mr. Okrent, who had subjected Ms. Martone to belittling and persistent harassment and discrimination, while she had simply reported inappropriate conduct and had not done anything wrong.

109. That same day, Ms. Martone also separately emailed David deBang, Senior Account Director of Jet Aviation, asking when the crew meeting would be taking place, as she had been removed from the schedule and had no scheduled trips.

110. In response, Mr. deBang stated that the meeting was planned for later that week, on September 27, 2019.

111. Ms. Martone also asked Mr. deBang what the Blacks would be told regarding her being grounded. Mr. deBang responded, communicating to Ms. Martone that the Blacks were

16

aware of the entire situation including Ms. Martone's complaints about discrimination, harassment and workplace safety issues.

112.    During the "investigation," the Company made no efforts to interview Ms. Martone or seek verification of her conversation with Mr. Okrent from Ben Robertson, the other pilot present and witness to the interaction.

113.    On September 23, 2019, as Ms. Martone still had not been put back on the work schedule, Ms. Martone emailed Ms. Mazzola to follow up regarding the Company's alleged investigation, noting that she had not heard anything from the Company regarding its investigation or her complaints.

114.    In her email, Ms. Martone reiterated that Mr. Okrent's unprofessional behavior in the lobby was in violation of the Company handbook, and that she had complained about his wrongful behavior, which included discrimination, harassment and violations of workplace safety standards, for months.

115.    Ms. Martone further noted that Mr. Okrent's remarks that he "didn't care" or "didn't know" about the weather represented his lack of concern for a safe flight environment.

116.    Ms. Martone stated that these instances were all in violation of the Company's work etiquette and harassment policy, and sought to ensure that these issues would be dealt with or taken into account during the investigation.

117.    In response, Ms. Mazzola merely advised that she was "still gathering the final details" but would "finish shortly."

118.    On September 27, 2019, the day of their scheduled crew meeting, Ms. Martone was terminated.

119. Although the meeting had originally been scheduled to discuss Ms. Martone's concerns and complaints of discrimination, harassment and operational safety violations, such issues were never discussed at the meeting or anytime thereafter.

120. At the meeting, the Company claimed that "nothing came up" during their investigation, and merely stated that they had chosen to "end the business relationship" with Ms. Martone.

121. Significantly, Ms. Martone was terminated less than two months before she would have received a significant bonus of $25,000, which was to occur in December 2019.

122. The foregoing evidence more than amply demonstrates that the Defendants were seeking to terminate Ms. Martone in retaliation for her complaints of discrimination, harassment and workplace safety violations by Mr. Okrent.

123. After an unblemished record of excellent job performance, Ms. Martone was suddenly grounded and subject to an "investigation" regarding an incident initiated and prolonged by one of the Company's pilots, Mr. Okrent.

124. Without any given reason, ten days later, Ms. Martone was terminated.

125. Ms. Martone was never given any legitimate reason for her termination, either verbally or in writing.

126. Notably, the Company did not at the time, and could not, claim that Ms. Martone was terminated as a result of any alleged misconduct, as the Company informed Ms. Martone at the time of her termination that she was eligible for rehire and contract work.

127. Moreover, Ms. Martone was amply qualified for her position, received numerous accolades and praise during her employment with the Defendants, and never received any criticism of her job performance.

128. These facts demonstrate the that Ms. Martone was retaliated against for her complaints of discrimination, harassment and violations of workplace safety.

129. The failure of the Company to provide Ms. Martone any reason for her termination, the harassing and one-sided incident allegedly serving as a basis for her grounding and investigation, and the excellent record of her job performance, all indicate that the Defendants had no legitimate reason to ground or terminate Ms. Martone.

130. In addition, the facts herein demonstrate that the "investigation" regarding the September 17, 2019 incident was a pretext and fabricated reason to terminate Ms. Martone. The alleged investigation took place over ten days, including weekend days. Ms. Martone had never been contacted to provide an interview, provide any facts, or provide her side of the story. Nor did the Company seek an unbiased, objective account of the exchange from Company pilot Ben Robertson, who had witnessed the entire event. Further, even at her termination, the Company informed her that she was eligible for rehire and/or contract work.

131. From the time of her initial complaints to Mr. Mihok, and then to Dani Mickel about sex discrimination and harassment and potential violations of laws or regulations relating to safety, the attitude of Mr. Mihok, Mr. Okrent and the other pilots worsened. They were unwilling to communicate with Ms. Martone in any meaningful way, and their demeanor became even more openly hostile when they did communicate with her. They began to treat her even more negatively than they had treated her before when compared to the male team members, including increased yelling, increased verbal abuse, and an increased level of disrespect displayed toward Ms. Martone.

132. For example, during the incident at the hotel where Mr. Okrent aggressively confronted Ms. Martone, Mr. Okrent specifically referenced her complaints to Human Resources and her concerns she had raised regarding safety issues. Mr. Okrent specifically berated Ms.

19

Martone for daring to complain to Human Resources about sex discrimination and harassment and for raising her concerns about safety issues with Human Resources and others.

133. Ms. Martone also is aware that, upon information and belief, after she began raising her concerns about safety issues, Defendants, including Mr. Okrent, asked Mr. Feinstein to remove Ms. Martone from her role of Safety Representative that he had previously assigned to her.

134. The timing of Ms. Martone's termination, coupled with the lack of any legitimate justification for her termination, the differential treatment she received as a female employee, the openly hostile atmosphere for female employees, and intervening pattern of antagonism following her complaints, indicates that the real reason for Ms. Martone's termination was discrimination and retaliation on the part of Defendants.

135. Despite previously failing to provide Ms. Martone a reason for her termination, and indicating that she was eligible for rehire, Ms. Martone has learned that Defendants now claim, as a litigation position in response to Ms. Martone's OSHA Complaint, that Ms. Martone's employment was terminated as a result of her engaging in abusive behavior directed at another crew member – Mr. Okrent – during their interaction in the hotel lobby described herein.

136. This proffered explanation is further suspect because it appears to be a shift in the reason. At the time of her termination, Ms. Martone was not provided with any justification for her termination and was instead told that she was eligible for rehire and/or contract work. This is completely incompatible with an employee who was actually fired for "abusive behavior" that Defendants have since claimed as the reason for termination, as a litigation position.

137. The circumstances surrounding Ms. Martone's employment and termination indicate that the Defendants sought to terminate her employment as a result of discrimination and retaliation.

138. Ms. Martone's termination was pretextual.

139. Ms. Martone's termination was wrongful.

140. The above facts demonstrate that, after Ms. Martone's numerous complaints of harassment, discrimination and workplace safety violations by Mr. Okrent, the Defendants determined to terminate Ms. Martone, and used Mr. Okrent's public verbal assault on Ms. Martone as an excuse to do so, falsely purporting to conduct an "investigation" that never actually took place.

141. Given her treatment during her employment with the Defendants, and the circumstances surrounding her termination, Ms. Martone maintains that the Defendants engaged in unlawful harassment and discrimination, and retaliation against Ms. Martone for her complaints of the harassment and discrimination, as well as her complaints regarding workplace safety she reasonably believed were taking place, in violation of the New Jersey Conscientious Employee Protection Act ("CEPA") and the New Jersey Law Against Discrimination ("NJLAD").

142. Ms. Martone has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and inactions of the Defendants.

143. Defendants' agents and employees involved in Ms. Martone's termination all acted with the intent of causing, or in reckless disregard of the probability that their actions would cause Ms. Martone severe emotional distress.

144. Ms. Martone has suffered significant financial losses and economic harm as a proximate result of the actions and inactions of Defendants including, among other things, lost wages, lost bonus and an obligation for attorneys' fees and costs of pursuing this action.

145. Ms. Martone has suffered significant damage to her career prospects and professional reputation as a proximate result of the actions and inactions of Defendants.

## COUNT I
## Conscientious Employee Protection Act, , N.J.S.A. 34:19-1 et seq.
## (Plaintiff v. All Defendants)

146. Plaintiff Kathryn Martone repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

147. During her employment with Jet Aviation and the Blacks, Ms. Martone observed operational safety concerns that were detrimental to the overall safety of passengers and crew onboard the aircraft.

148. Due to the foregoing, Plaintiff reasonably believed that Defendants were either in violation of a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare.

149. Plaintiff disclosed and reported the perceived violations and incompatibilities to Lead Captain Chris Mihok, Cabin Attendant Supervisor Dani Mickel, and Human Resources.

150. As made clear by Mr. deBang, the Blacks were also aware of Ms. Martone's complaints regarding safety issues prior to her termination.

151. Defendants retaliated against Plaintiff by terminating her employment because Plaintiff disclosed the illegal and wrongful violations she believed were taking place at Jet Aviation to her supervisors and the Company's Human Resources representative.

152. The timing of Plaintiff's termination, coupled with the facts described herein including increasingly hostile treatment following her complaints by Mr. Okrent and Mr. Mihok, and Mr. Okrent's direct reference to his displeasure with Ms. Martone's raising her concerns during the hotel lobby incident, demonstrates that the reason for her termination, and Defendants' other retaliatory measures directed toward Plaintiff, was Plaintiff's reporting of what she believed to be illegal activity or activity that she believe to be illegal or in violation of a law or rule or

regulation issued under the law, or incompatible with, a clear mandate of public policy concerning public health, safety or welfare.

153. As the direct result of the aforesaid unlawful practices engaged in by Defendants, Plaintiff has sustained a loss of earnings, loss of severance, retirement and other benefits, loss of incentive and bonus payments, severe emotional and psychological distress, loss of self-esteem, loss of reputation and opportunity for career advancement, loss of future earning power, an obligation for attorneys' fees and costs of bringing this action, as well as back pay, front pay and interest due thereon.

154. Plaintiff is now suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendants' actions unless and until this Court grants the relief requested herein.

**COUNT II**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.**
**(Plaintiff v. Jet Aviation, Leon Black and Debra Black)**

155. Plaintiff Kathryn Martone repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

156. Based on the foregoing, Jet Aviation, Leon Black and Debra Black engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

157. In discriminating against and harassing Ms. Martone on the basis of her sex and creating a hostile working environment as a result of Ms. Martone's sex as alleged herein, and in retaliating against her for her complaints of discrimination and harassment, Jet Aviation, Debra Black and Leon Black violated Title VII.

158. Defendants' violations were intentional and willful.

23

159.     Defendants' violations warrant the imposition of punitive damages.

160.     As a direct result of the unlawful employment practices engaged in by Defendants, Plaintiff Kathryn Martone has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

**COUNT III**
**New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 <u>et seq</u>.**
**(Plaintiff v. All Defendants)**

161.     Plaintiff Kathryn Martone repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

162.     Based on the foregoing, Defendants engaged in unlawful employment practices in violation of the New Jersey Law Against Discrimination.

163.     In harassing and discriminating Ms. Martone on the basis of her sex and creating a hostile working environment as a result of Ms. Martone's sex as alleged herein, and in retaliating against her for complaining about harassment and discrimination, Defendants Jet Aviation, Leon Black and Debra Black violated the New Jersey Law Against Discrimination.

164.     Defendants Russell Okrent, Leon Black and Debra Black aided and abetted discrimination, harassment and retaliation by Jet Aviation as described herein.

165.     Said violations were intentional and willful.

166.     Said violations warrant the imposition of punitive damages.

167.     As a direct result of the aforesaid unlawful employment practices engaged in by Defendants, Plaintiff has sustained a loss of earnings, loss of severance, retirement and other benefits, loss of incentive and bonus payments, severe emotional and psychological distress, loss

of self-esteem, loss of reputation and opportunity for career advancement, loss of future earning power, as well as back pay, front pay and interest due thereon.

168. Plaintiff is now suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendants' actions unless and until this Court grants the relief requested herein.

## **PRAYER FOR RELIEF**

169. Plaintiff Kathryn Martone repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants:

a. Enjoining future violations of CEPA, Title VII and NJLAD by Defendants;

b. Ordering appropriate equitable relief;

c. Ordering Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful conduct in violation of CEPA and the NJLAD;

d. Ordering Defendants to pay Plaintiff for all compensatory damages suffered;

e. Ordering Defendants to pay Plaintiff liquidated damages;

f. Ordering Defendants to pay Plaintiff punitive damages;

g. Ordering Defendants to pay Plaintiff's attorneys' fees and costs;

h. Ordering Defendants to pay Plaintiff any and all other remedies available pursuant to CEPA, Title VII and NJLAD; and

i. Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff Kathryn Martone hereby demands trial by jury as to all issues so triable.

By: _____
    Christopher A. Macey, Jr., Esquire
    Bell & Bell LLP
    1617 John F. Kennedy Boulevard
    Suite 1254
    Philadelphia, PA 19103
    (215) 569-2500
    *Attorneys for Plaintiff Kathryn Martone*

Dated: August 3, 2020