<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KATHRYN MARTONE,<br><br>Plaintiff,<br><br>v.<br><br>JET AVIATION FLIGHT SERVICES, INC., RUSSELL OKRENT, LEON BLACK, AND DEBRA BLACK,<br><br>Defendants. | Case No. 2:19-cv-21011 (BRM) (ESK)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Motion to Dismiss (ECF No. 35) filed by Defendants Jet Aviation Flights Services, Inc. ("JAFS"), Russell Okrent ("Okrent"), and Leon Black and Debra Black (the "Blacks") (collectively, "Defendants") seeking to dismiss Plaintiff Kathryn Martone's ("Plaintiff") Amended Complaint ("Amended Complaint" or "Am. Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposes the motion. (ECF No. 36.) Pursuant to Federal Rule of Civil Procedure 78(b), this Court did not hear oral argument. For the reasons set forth herein and for good cause shown, Defendants' Motion to Dismiss (ECF No. 35) is **DENIED**.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

In considering this Motion to Dismiss, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

This matter stems from the termination of Plaintiff, a Cabin Safety Attendant, from JAFS, a private airline company that provides charter services for private business aircrafts, for alleged retaliation for reporting unsafe operational and workplace safety practices as well as unlawful discrimination and harassment. Plaintiff alleges the Blacks were decision-makers with respect to hiring and firing, and JAFS and the Blacks, at all relevant times, employed more than fifteen employees, including Plaintiff. (*See* ECF No. 32 ¶¶ 19, 22.)

Plaintiff was hired by JAFS and the Blacks in or about May 2018. (*Id.* ¶¶ 27, 29.)[2] As a Cabin Safety Attendant, Plaintiff worked with the flight crew or "team" to ensure passenger safety and comfort on flights. (*Id.* ¶ 29.) Plaintiff excelled at her position, received substantial praise from crew and clients, and was informed numerous times by Lead Captain Chris Mihok ("Mihok") that she was doing "a great job." (*Id.* ¶ 33.) Moreover, Plaintiff had never received any negative evaluations or reports on her job performance. (*Id.* ¶ 34.)

Throughout her employment with JAFS and the Blacks, Plaintiff was "consistently treated differently, yelled at, verbally abused, and disrespected on the basis of her sex." (*Id.* ¶ 35.) The other three members of Plaintiff's team, all of whom were male, were not treated in the same

---

[1] The Court refers the reader to the Court's February 28, 2020 Opinion for additional factual and procedural background (*See* ECF No. 31.)

[2] JAFS was retained by the Blacks to provide jet charter services for a Gulfstream 650 business jet airplane, which is owned by the Blacks. (*Id.* ¶ 26.)

2

"negative, abusive and disrespectful matter" as Plaintiff. (*Id.* ¶ 36.) In particular, Okrent, a JAFS pilot on Plaintiff's team, consistently "singled out" Plaintiff by subjecting her to verbal abuse and harassment on a daily basis. (*Id.* ¶ 37.) Okrent also made negative comments or jokes about women, including: (1) where a woman's "proper place" was; (2) that older, specifically female, flight attendants were "useless"; and (3) sexually graphic comments like "I feel like I was rode hard and put away wet," after almost every long flight. (*Id.* ¶¶ 41, 42, 44.)[3] When Plaintiff voiced her concerns about these comments to Mihok in front of Okrent, Okrent told Plaintiff to "chill out." (*Id.* ¶ 44.) Further, if Plaintiff attempted to reference the size of something using her hands, for example, to indicate a small amount, Mihok would say, "you can't do that in front of a man, we are sensitize to size." (*Id.* ¶ 45.) Plaintiff alleges sexual comments "were made on every, or nearly every trip" Plaintiff worked on with JAFS. (*Id.* ¶ 46.)

In addition to "numerous instances of harassment and discrimination on the basis of her sex," Plaintiff, who was appointed Safety Representative by Matt Feinstein ("Feinstein"), a JAFS Safety Officer, consistently sought and requested operational safety procedures and protocols for the safety of passengers and crew, but her requests were "ignored or dismissed" or ridiculed. (*Id.* ¶¶ 48–49.) The Flights Operations Manual Section 5.3.3 ("Operations Manual") states what information should be reviewed before each flight. (*Id.* ¶ 51.) Her repeated requests for safety briefings, which were intended to ensure crew and passenger safety and help the pilots understand the desired sequence of events and action, were often ignored or met with "scorn and annoyance." (*Id.* ¶¶ 53, 55.) For example, when Plaintiff made requests for weather and turbulence prediction reports, Okrent would generally respond by "laughing, sighing, or making inappropriate

---

[3] Plaintiff alleges both Mihok and Okrent made sexually graphic comments. (*Id.* ¶ 44.)

comments." (*Id.* ¶ 56.) On one occasion, in response to a request for a weather report, Okrent replied "I don't know and I don't care," and stated he "didn't even look at [weather reports]." (*Id.* ¶¶ 57–58.)[4] Plaintiff, believing Defendants, and in particular Okrent's "blatant lack of interest in aviation safety" was "in violation of a law or rule or public regulation . . . [or] . . . public policy," brought her concerns to Mihok. (*Id.* ¶ 60.)[5] In response, Mihok noted Okrent apologized and asked Plaintiff "what more" she wanted, "implying that her valid safety concerns and requests to follow proper procedures were unimportant and bothersome." (*Id.* ¶ 62.) In another incident, Plaintiff messaged Mihok about a flight in which Okrent turned off all cabin power and lights thereby creating a potential safety hazard. (*Id.* ¶ 64.) When Plaintiff asked Okrent what happened with the loss of power and lights, Okrent responded, "I pushed a wrong button, leave me alone." (*Id.* ¶ 65.) Plaintiff also requested to Mihok and another crew member, Ben Robertson, that she be kept informed of all information and developments relating to a flight but received no response. (*Id.* ¶ 67.) When Plaintiff complained to Mihok about sex discrimination and harassment and her concerns that Defendants were in violation of a law, regulation, or public policy as a result of, among other things, Defendants' "failure to provide weather/turbulence reports and crew briefings," Plaintiff was told to "let it go." (*Id.* ¶¶ 70–71.)

Following her complaints to Mihok, the team continued to harass Plaintiff and dismiss her safety concerns and attempts to follow regulation and procedure. (*Id.* ¶ 72.) Accordingly, on August 23, 2019, Plaintiff reported her concerns to a new supervisor, Cabin Attendant Supervisor

---

[4] Plaintiff contends the weather and turbulence prediction reports and crew briefings were "integral to the safety of the crew and passengers." (*Id.* ¶ 59.)

[5] Plaintiff asserts she believed Defendants were violating "orders, regulations, and/or standards of the Federal Aviation Administration (FAA) and/or other provisions of Federal law relating to air carrier safety." (*Id.* ¶ 68.)

Dani Mickel ("Mickel"). (*Id.* ¶ 73.) Mickel "made an excuse" for every incident of discrimination, harassment, and Defendants' dismissal of her attempts to ensure proper safety in the aircraft, and Plaintiff was again told to "let it go." (*Id.* ¶¶ 75–76.) Thereafter, Plaintiff contacted Courtney Mazzola of Human Resources ("Mazzola") and informed Mazzola that neither Mihok nor Mickel took her complaints about discrimination and harassment or workplace safety seriously. (*Id.* ¶ 77.) Plaintiff also requested a meeting with all the pilots to discuss her concerns, which never happened. (*Id.* ¶ 78.)[6]

On September 6, 2019, Plaintiff sent an email to all three pilots on her crew officially requesting crew briefings in accordance with the Operations Manual. (*Id.* ¶ 80.) In the email, Plaintiff wrote:

> Hey guys, going forward on all trips I would like to have full crew briefing[s] at some point during our [pre-departure] duties as it states in our Flight Operation Manual. (section 5.3.3). [It's] really important to me for good [crew resource management], as well as being important to the safety of the passengers and all crew.

(*Id.*) On the next trip, scheduled for September 14, 2019, Plaintiff discovered the aircraft was broken which would delay departure. (*Id.* ¶ 81.) She learned all the male members of her crew were aware of the delay but had not informed her. (*Id.*) On the following trip on September 17, 2019, Okrent approached Plaintiff as she was checking into a hotel and pulled her to the side. (*Id.* ¶ 83.) Okrent mocked Plaintiff's September 6, 2019 email and informed her he did not appreciate her complaints about him to JAFS and Human Resources. (*Id.* ¶ 86.) Plaintiff informed Okrent she had tried communicating her complaints to Okrent directly but he either ignored her or criticized her. (*Id.* ¶ 87.) At some point, the conversation between Plaintiff and Okrent escalated and a hotel

---

[6] Despite the ongoing issues, Plaintiff "continued to perform her duties in an excellent manner, while seeking ways to improve the communication and teamwork between her and her team." (*Id.* ¶ 79.)

5

manager approached them and requested they "take their conversation elsewhere." (*Id.* ¶ 92.) Plaintiff "extricated herself" to go to her hotel room and texted Okrent to inform him she would no longer have any non-work-related conversations with him, and any issues between them should be discussed at the upcoming meeting Plaintiff previously requested. (*Id.* ¶ 93.) Plaintiff also immediately contacted Human Resources concerning the confrontation in the hotel lobby. (*Id.* ¶ 94.) Plaintiff further commented to Human Resources she had been "complaining for months about sex discrimination, sexual harassment and violations of what she believed to be laws regulations or safety issues" but was ignored by JAFS and her crew. (*Id.* ¶ 96.)

Later that day, Plaintiff's supervisor escorted her to meet with Mazzola and an account manager. (*Id.* ¶ 98.) At this meeting, Plaintiff was told she was being "grounded" for her "aggressive behavior" involving Okrent in the hotel lobby. (*Id.* ¶ 99.) While Plaintiff tried to explain "the reality of the situation," namely that despite "repeatedly stating that their issues should be discussed at a proper meeting," Okrent "cornered her" for purposes of harassing and verbally abusing her. (*Id.* ¶ 100.) Mazzola "ignored" Plaintiff's version of the incident and told Plaintiff she would not be on the next trip and was not to contact the Blacks concerning the situation. (*Id.* ¶ 101.) Plaintiff inquired as to whether Okrent was being "grounded" and was told he was. (*Id.* ¶ 102.) Plaintiff also alleges, on September 5, 2019, significantly prior to her interaction with Okrent, but after Plaintiff made repeated complaints, Plaintiff learned she had been removed from a trip scheduled for September 8, 2019. (*See id.* ¶ 103.)

After the meeting with Mazzola on September 17, 2019, Plaintiff wrote Mazzola a detailed version of her account of what transpired between herself and Okrent in the hotel lobby as well as a copy of the text she sent to Okrent. (*Id.* ¶ 104.) Thereafter, Plaintiff was removed from the work schedule (*id.* ¶ 105) and discovered Okrent had not been grounded and was still permitted to fly.

6

(*Id.* ¶ 107.) On September 21, 2019, Plaintiff emailed Mazzola asking why she was still grounded and had been entirely removed from the work schedule while Okrent still had several upcoming flights. (*Id.* ¶ 108.) Plaintiff also emailed David deBang ("deBang"), Senior Account Director of JAFS, asking when the crew meeting would take place, as she had been removed from the schedule and had no upcoming trips. (*Id.* ¶ 109.) DeBang responded the meeting was scheduled for September 27, 2019. (*Id.* ¶ 110.) Plaintiff also asked what the Blacks were told concerning her grounding. (*Id.* ¶ 111.) DeBang responded the Blacks were fully aware of the entire situation, "including [Plaintiff's] complaints about discrimination, harassment, and workplace safety issues." (*Id.*) At some point, Plaintiff was informed an investigation into Plaintiff's complaints and the incident between herself and Okrent would take place. (*See id.* ¶ 112.) On September 23, 2019, Plaintiff emailed Mazzola to inquire (1) why she had not been placed back on the work schedule and (2) to follow up on the alleged investigation. (*Id.* ¶ 113.)[7] In response, Mazzola advised she was "still gathering the final details," but would "finish shortly." (*Id.* ¶ 117.) On September 27, 2019, the day of the scheduled meeting, Plaintiff was terminated. (*Id.* ¶ 118.)[8] On October 25, 2019, Plaintiff filed a retaliation complaint with the Occupational Safety and Health Administration ("OSHA"). (*Id.* ¶ 1 n.1.)

Though there was a meeting scheduled to discuss Plaintiff's complaints, this meeting never took place and the complaints "were never discussed at the meeting or anytime thereafter." (*Id.* ¶ 120.) JAFS claimed "nothing came up" during their investigation and "merely stated" they had

---

[7] In this follow-up email, Plaintiff reiterated Okrent's unprofessional behavior was in "violation of the Company handbook, and that she had complained about his wrongful behavior, which included discrimination, harassment and violations of workplace safety standards, for months." (*Id.* ¶ 114.)

[8] Plaintiff notes she was terminated less than two months before she was to receive a "significant bonus of $25,000." (*Id.* ¶ 121.)

chosen to "end the business relationship" with Plaintiff. (*Id.*) Plaintiff also discovered after she began raising concerns about workplace safety, Defendants, including Okrent, asked Feinstein to remove Plaintiff from her role as Safety Representative. (*Id.* ¶ 133.) Plaintiff also contends Defendants now claim, "as a litigation position in response to [Plaintiff's] OSHA Complaint," Plaintiff's employment was terminated as a result of her "abusive behavior" toward Okrent, which according to Plaintiff, is "completely incompatible" with Defendants' previous reason for her termination —namely, Defendants' initial failure to provide Plaintiff a reason for her termination and indication she was eligible for rehire. (*Id.* ¶ 135.)

On December 4, 2019, Plaintiff filed a complaint alleging Defendants violated the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1, *et seq*. ("CEPA") and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq*. ("NJLAD"). (ECF No. 1.) On March 18, 2020, Defendants moved to dismiss Plaintiff's complaint for failure to state a claim. (ECF No. 13.) On April 20, 2020, Plaintiff filed an opposition. (ECF No. 23.) On July 13, 2020, the Court granted Defendants' motion to dismiss and permitted Plaintiff to file an amended complaint. (ECF Nos. 30 and 31.)[9] On August 3, 2020, Plaintiff filed an amended complaint alleging Defendants violated CEPA, NJLAD, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, *et seq.* ("Title VII"). (ECF No. 32.) On August 31, 2020, Defendants filed the Motion to Dismiss. (ECF No. 35.) On September 21, 2020, Plaintiff filed an Opposition. (ECF No. 36.) On September 28, 2020, Defendants filed a Reply. (ECF No. 38.)

---

[9] Specifically, Plaintiff sought to add a claim pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"). The Title VII claim was not included in Plaintiff's initial complaint because Plaintiff had not yet exhausted her administrative remedies. At oral argument, Plaintiff's counsel represented to the Court he was in the process of obtaining a Right to Sue letter from the Equal Employment Opportunity Commission. (*See* ECF No. 30.)

8

**II.    LEGAL STANDARD**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of [her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

### III. DECISION

Plaintiff asserts three separate claims against Defendants. The Court will address each one in turn.

#### A. CEPA (Count I)

Defendants argue, in part, Plaintiff's Amended Complaint fails to state a claim under CEPA because: (1) Plaintiff's newly-added allegation that after she began raising concerns about safety issues, Defendants, including Okrent, asked Feinstein to remove Plaintiff from the role of Safety

Representative is "meaningless," and fails, once again, to support a CEPA claim; (2) Plaintiff's allegation that Defendants represented to OSHA inconsistent reasons for her termination will also not save Plaintiff's claim because Defendants' reason for termination is not inconsistent and Plaintiff is merely alleging "exactly the same chronology as before"; and (3) even if Plaintiff engaged in protected activity, the Airline Deregulation Act ("ADA") preempts Plaintiff's CEPA claim requiring its dismissal. (ECF No. 35-1 at 17–20.)[10] Plaintiff opposes, arguing: (1) after she complained about Defendants' safety issues she was retaliated against by Defendants who sought to have her removed from her role as Safety Representative; (2) Defendants initially failed to provide any specific reasons for Plaintiff's termination and indicated she was eligible for rehire;[11] and (3) case law and the facts of this case demonstrate the ADA does not preempt Plaintiff's CEPA claim. (ECF No. 36-2 at 21–24.)

CEPA aims to afford broad protection to employees who report suspected violations of law or public policy from an employer's retaliatory acts. *See* N.J. Stat. Ann. § 34:19-1 *et seq*. A plaintiff seeking to demonstrate a *prima facie* case under CEPA must allege: (1) the plaintiff reasonably believed the employer's conduct violated a law or regulation; (2) the plaintiff performed "whistle-

---

[10] Defendants also contend Plaintiff failed to allege she engaged in protected activity under CEPA. (ECF No. 35-1 at 19.) Defendants argue Plaintiff "cites again to JAFS'[s] [Operations Manual] . . . ," which is not a law, rule or regulation, and therefore, Plaintiff's complaints did not constitute whistleblowing activity. (*Id.* at 19–20.) The Court does not agree with this characterization. Plaintiff alleges she believed Defendants were violating the Operations Manual, as well as "a law or rule or regulation issued under the law, or incompatible with, a clear mandate of public policy," including "standards of the Federal Aviation Administration (FAA)" and other "federal law relating to air carrier safety." (ECF No. 32 ¶ 68.) CEPA does not require Plaintiff to show her employer actually violated the law or public policy, rather, Plaintiff must simply show she "reasonably believes" Defendants' conduct violated a law or regulation. Plaintiff has satisfied that burden. *See Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 91 (3d Cir. 1999).

[11] According to Plaintiff, Defendants, in an effort to "cover up the real reason for her termination— retaliation," now assert Plaintiff was terminated as a result of "abusive behavior," toward Okrent.

11

blowing activity" as defined in CEPA; (3) an adverse employment action has been taken against her; and (4) the whistle-blowing activity caused such adverse employment action. *See Kolb v. Burns*, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999); *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). CEPA covers employee complaints about activities the employee reasonably believes are: (1) in violation of a specific statute or regulation; (2) fraudulent or criminal; or (3) incompatible with policies concerning public health, safety, or welfare or the protection of the environment. *See Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 550 (N.J. 2000). However, "CEPA does not require that the activity complained of . . . be an actual violation of a law or regulation, only that the employee 'reasonably believes' that to be the case." *Id.* at 552.

Once a plaintiff has established a prima facie case under CEPA, courts employ the burden-shifting analysis that is used in federal discrimination cases involving "pretext" claims. *Blackburn v. United Parcel Servs., Inc.*, 179 F.3d 81, 92 (3d Cir. 1999). Under this test, "the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d. Cir. 1997) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Once the defendant articulates a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff. *See id.* Then, "the plaintiff must convince the factfinder 'both that the reason [given by the employer] was false, and that [retaliation] was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Here, the Amended Complaint does not actually allege Plaintiff was removed from her position as Safety Representative. Therefore, Plaintiff has failed to allege this specific adverse employment action was taken against her. *Rickerson v. Pinnacle Foods Inc.*, Civ. A. No.

21704469, 2017 WL 6034147, at *3 (D.N.J. Dec. 6, 2017).[12] Plaintiff cites the same two incidents as her previous complaint to demonstrate Defendants' retaliatory conduct. First, Plaintiff states that on September 5, 2019, following her complaints, she learned she was removed from a trip that had been scheduled for September 8, 2019. (ECF No. 32 ¶ 103.) Second, Plaintiff states she complained to Human Resources on September 17, 2019, following a verbal altercation in a hotel lobby between her and Okrent that became so confrontational it required the intervention of a hotel manager. (*Id.* ¶ 104.) Following her report, Defendants first removed Plaintiff from the upcoming flight schedule and then terminated her ten days later. (*See id.* ¶¶ 105, 118.) The Amended Complaint also alleges that in an email exchange dated September 21, 2019 between deBang and Plaintiff, deBang conveyed "the Blacks were aware of the entire situation including [Plaintiff's] complaints about discrimination, harassment, and workplace safety issues." (*Id.* ¶ 111.) Thereafter, just six days later, on September 27, 2019, Plaintiff was terminated.

At this juncture, and in particular where the Amended Complaint alleges the Blacks had knowledge or awareness of Plaintiff's whistleblowing activity, the Court cannot say Plaintiff has failed to allege any facts suggesting pretextual retaliation. *Ragan v. Fuentes*, Civ. A. No. 05-2825,

---

[12] A "retaliatory action" for purposes of CEPA "means the discharge, suspension, or demotion of an employee, or other adverse employment action taken against an employee in terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Interpreting that language, some courts have held the employer's action must affect the employee's compensation or rank, or "be virtually equivalent to discharge." *Klein v. Univ. of Med. & Dentistry of N.J.*, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005); *see also Caver v. City of Trenton*, 420 F.3d 243, 249 (3d Cir. 2005). Other decisions, with which Court agrees, have taken a somewhat broader view. Examples of actionable retaliatory acts have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements and facilities," and altered "promotional procedures." *Beasley v. Passaic Cnty.*, 873 A.2d 673, 685–86 (N.J. Super. Ct. App. Div. 2005); *Southward v. Elizabeth Bd. of Educ.*, Civ. A. No.15-3699, 2017 WL 111924, at *5 (D.N.J. Jan. 11, 2017).

2007 WL 2892948, at *8 (D.N.J. Sept. 28, 2007). Moreover, where, as here, a plaintiff alleges an employer provided inconsistent explanations for the challenged employment action, that circumstance can be relevant to a determination of causation. *See Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 857 (D.N.J. 2019) (noting that retaliation can be inferred from "inconsistencies or contradictions in the employer's proffered legitimate reasons for its action"); *Levins v. Braccia*, Civ. A. No. 4290-07T2, 2009 WL 1658610, at *7 (N.J. Super. Ct. App. Div. June 16, 2009). Therefore, the Court finds Plaintiff's CEPA claim is sufficient to withstand the Motion to Dismiss.[13]

Next, the Court turns to the issue of whether the ADA expressly preempts Plaintiff's CEPA claim. Defendants argue the ADA preempts Plaintiff's CEPA claim because her complaints "relate to" the "services of an air carrier" which requires dismissal under the ADA. (ECF No. 35-1 at 7.) Plaintiff opposes, arguing her claim does not "implicate the service of a flight" but rather pertains to "weather reports and crew briefings that Defendant refused to provide, which put passenger and crew safety at risk," and therefore, does not require dismissal. (ECF No. 36-2 at 25.)

"Congress enacted the ADA in 1978 to prevent the states from re-regulating airline operations so that competitive market forces could function." *Gary v. The Air Grp., Inc.*, 397 F.3d 183, 186 (3d Cir. 2005) (citations omitted). The ADA includes a preemption clause: "a State . . .

---

[13] The Court notes "[o]ne way that a plaintiff may establish causation through circumstantial evidence is by showing a temporal proximity between the protected conduct and the alleged retaliation." *Perry v. Lee*, Civ. A. No. 1917899, 2020 WL 3396805, at *7 (D.N.J. June 19, 2020) (citing *Choy v. Comcast Cable Comms., LLC*, 629 F. App'x 362, 365 (3d Cir. 2015)). It is, however, "important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 856 (D.N.J. 2019). Indeed, there may be "valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Johnson–Winters v. Redner's Mkt. Inc.*, 610 F. App'x 149, 154 (3d Cir. 2015).

may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1). "Services" include, at the very least, the "prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail." *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 193 (3d Cir. 1998) (approving of the Ninth Circuit's definition of "services" in *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261 (9th Cir. 1998) (en banc)). But state law is not preempted if the claim has a connection to flight services that is "too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Morales Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992) (internal citations omitted); *see, e.g.*, *Anderson v. Am. Airlines, Inc.*, 2 F.3d 590, 597 (5th Cir. 1993) (finding that a claim based on an airline's alleged retaliation against a mechanic for filing a workers' compensation action was not preempted because "[a]ny effect that such a claim may have on American's services is far too remote to trigger pre-emption").

Here, the central issue is whether Plaintiff's claim of retaliation for objecting to workplace safety has a "forbidden significant effect" upon an air-carrier's "point-to-point transportation," or whether the connection to this service is "too tenuous, remote, or peripheral." *Flashman v. Jet Aviation Flight Servs., Inc.*, Civ. A. No. 14-1287, 2014 WL 4930909, at *3 (D.N.J. Oct. 1, 2014). The connection, however, between Plaintiff's CEPA claim, purportedly based on her objection to Defendants' workplace safety conditions and point-to-point transportation, is "simply too remote and too attenuated," *Gary*, 397 F.3d at 189, and therefore, "cannot be deemed to be related to the 'service of an air carrier,'" *id.* at 189 n.6. Instead, Plaintiff's actions are "more properly viewed as comparable to a garden variety employment claim." *Id.* at 189 (reversing and holding that plaintiff's state law whistleblower claim was not "related to" the "service of an air carrier" within the meaning of the ADA, and therefore plaintiff's retaliation claim was not preempted by the

15

ADA); *Cunningham v. Jet Aviation Flight Servs., Inc.*, Civ. A. No. 12-6594, 2013 WL 1758617, at *4 (D.N.J. Apr. 24, 2013) (providing that "to the extent [p]laintiff's state law claims arise from her complaints concerning [cabin service representative] training, those claims are not preempted and will not be dismissed pursuant to Rule 12(b)(6)").

Accordingly, for the reasons set forth above, Defendants' Motion to Dismiss the CEPA claim is **DENIED**.[14]

### B.  Title VII (Count II) and NJLAD (Count III)[15]

Plaintiff asserts two causes of action under Title VII[16] and NJLAD: (1) sex-based discrimination based on a hostile work environment; and (2) retaliatory discharge. Defendants

---

[14] The Court notes while CEPA primarily imposes liability for retaliatory acts upon an "employer"—here, the Blacks and JAFS, (*see* ECF No. 32 at 5), the Court finds dismissing the CEPA claim against any individual non-employer defendant, namely Okrent, is premature. Following discovery, however, Plaintiff will be required to demonstrate the kind of personal involvement that would render *each* individual defendant liable. *Southward v. Elizabeth Bd. of Educ.*, Civ. A. No. 15-3699, 2017 WL 111924, at *11 (D.N.J. Jan. 11, 2017) (providing that under CEPA an "employer" also includes a "person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent," which means "CEPA liability may attach to individuals who perform retaliatory acts with the authorization of their employers") (citing N.J. Stat. Ann. § 34:19-2(a); *Bowen v. Parking Auth. of City of Camden*, Civ. A. No. 00-5765, 2003 WL 22145814, at *22 (D.N.J. Sept. 18, 2003)).

[15] Because New Jersey courts "have frequently looked to case law under Title VII . . . for guidance in developing standards to govern the resolution of LAD claims," the Court will analyze the NJLAD claims together with the Title VII claims. *Stallone v. Camden Cnty. Tech. Sch. Bd. of Educ.*, Civ. A. No. 12-7356, 2013 WL 5178728, at *3 (D.N.J. Sept. 13, 2013); *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) (providing that an analysis of claims made pursuant to NJLAD generally follows the analysis of Title VII claims); *see Newton-Haskoor v. Coface N. Am.*, Civ. A. No. 11-3931, 2012 WL 1813102, at *7 (D.N.J. May 17, 2012), *aff'd*, 524 F. App'x 808 (3d Cir. 2013).

[16] In order to pursue claims under Title VII in federal court, a plaintiff must first exhaust administrative remedies by timely filing an EEOC charge and receiving a notice of the right to sue. *Kirman v. United Parcel Serv., Inc.*, Civ. A. No. 15-2357, 2015 WL 7720494, at *7 (D.N.J. Nov. 30, 2015). "[T]he parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the [EEOC]."

contend these claims fail because Plaintiff failed to plausibly allege facts necessary to infer discriminatory intent. (ECF No. 35-1 at 12–13.)

### i. Title VII and NJLAD Sex-based discrimination[17]

Defendants contend "the amended complaint is no less conclusory than the original complaint." (ECF No. 35-1 at 12.) Specifically, according to Defendants, "Plaintiff reiterates her original allegations with the addition of four claims [of] sexist comments attributed to Okrent and Mihok, from an unknown time." (*Id.*) Plaintiff alleges the Amended Complaint demonstrates an inference of sex discrimination and points to the following newly added allegations:

- Comments regarding a woman's "proper place." (ECF No. 1 ¶ 42);
- Comments that older, female flight attendants were "useless" (*Id.* ¶ 43);
- Sexual comments made "[a]fter almost every flight" such as "I feel like I was rode hard and put away wet." (*Id.* ¶ 44); and

---

*Mandel v. M&O Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976)). Here, Plaintiff alleges on July 27, 2020, the EEOC issued Plaintiff a Notice of Right to Sue. (ECF No. 32 ¶ 7.) *See Martone v. Jet Aviation Flight Servs. Inc.*, Civ. A. No. 219-21011 (BRM) (SCM), 2020 WL 3969919, at *7 (D.N.J. July 13, 2020) (noting that at oral argument, Plaintiff's counsel "represent[ed] to the Court he was in the process of obtaining a Right to Sue letter from the [EEOC]" and requested leave to amend the complaint to add a Title VII claim).

[17] The Court rejects Defendants' argument that because Mazzola, a female, "made the termination decision," it "undermines any inference of discrimination." (ECF No. 35-1 at 12.) "[T]here can be no absolute presumption that a person of one race would not discriminate against another person of the same race, there can be no absolute presumption that a person of one gender would not discriminate against another person of the same gender," *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Indeed, the Supreme Court in *Oncale* "reasoned that it is not the sex of the harasser or the victim that is important to a sexual harassment claim, but, rather, what is important is that the victim 'prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discriminat[ion] . . . because of . . . sex.'" 523 U.S. at 81 (citation omitted); *Cataldo v. Moses*, Civ. A. No. 02-2588, 2005 WL 705359, at *14 (D.N.J. Mar. 29, 2005) (providing that "in today's society, allegations of sexual harassment could be made by men or between people of the same gender, so this belief is insufficient to support his claim of gender discrimination").

- Comments that men were "sensitive to size" when Plaintiff attempted to reference a small amount of something. (*Id.* ¶ 45).

Further, Plaintiff alleges "[t]hese comments were made on every, or nearly every trip" that Plaintiff worked on and "thus occurred regularly." (*Id.* ¶ 47.)

To "state a claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that '(1) the employee suffered intentional discrimination because of [her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability.'" *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007) (internal quotations omitted). "Not every sexual comment, action or joke creates a hostile work environment." *Brown-Baumbach v. B&B Auto, Inc.*, 437 F. App'x 129, 133 (3d Cir. 2011). Instead, the actions must be "sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Courts apply the totality of the circumstances test, which involves analyzing "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168; *Hetzel v. Mabus*, Civ. A. No. 157271, 2016 WL 4157311, at *3 (D.N.J. Aug. 4, 2016). At this stage of the litigation, the alleged conduct, taken collectively, appears sufficiently severe and pervasive to alter the conditions of Plaintiff's employment.

Accordingly, for the reasons set forth above, Defendants' Motion to Dismiss the Title VII sex-based discrimination claim is **DENIED**.

18

### ii. Title VII and NJLAD Retaliation

Defendants argue Plaintiff's Title VII retaliation claim fails because, among other reasons, "[n]othing in the amended complaint alters the chronology of events that culminated in Plaintiff's termination." (ECF No. 35-1 at 14.) Specifically, according to Defendants, "[t]here is no 'unduly suggestive' temporal proximity alleged plausibly indicating an inference of retaliation." (*Id.*) Plaintiff contends the Amended Complaint "sufficiently alleges a claim for retaliation," and "had pled near immediate proximity in time between her complaints and the adverse actions." (ECF No. 36-2 at 13.)

To establish a prima facie case of retaliation under Title VII, a plaintiff must establish: "(1) the plaintiff engaged in protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there exists a causal connection between the adverse action and the protected activity." *Lanza v. Postmaster Gen. of U. S.*, 570 F. App'x 236, 240 (3d Cir. 2014) (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 231–32 (3d Cir. 2007)). A plaintiff asserting a retaliation claim must allege that she made a complaint "implicat[ing] an employment practice made illegal by Title VII." *Id.* at 203; *see also Spangler v. City of Phila.*, 523 F. App'x 142, 146 (3d Cir. 2013); *Hetzel*, 2016 WL 4157311, at *4.

Here, the parties mainly dispute whether Plaintiff alleges a causal connection between the protected activity and adverse action. (*See* ECF No. 35-1 at 14; ECF No. 36-2 at 14–15.) The Amended Complaint alleges that just six days after Plaintiff was informed the Blacks were "aware of the entire situation" involving the incident between Plaintiff and Okrent as well as Plaintiff's "complaints about discrimination, harassment, and workplace safety issues," Plaintiff was terminated. (ECF No. 32 ¶ 111.) The Court is satisfied that Plaintiff's Amended Complaint suggests a close temporal proximity between the complained of discrimination and her

19

termination. *See Lombard v. N.J. Dep't of Transp.*, Civ. A. No. 1801319, 2018 WL 5617553, at *8 (D.N.J. Oct. 30, 2018).

Accordingly, for the reasons set forth above, Defendants' Motion to Dismiss Plaintiff's Title VII retaliation claim is **DENIED**.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED**. An appropriate order follows.

Dated: April 26, 2021

*/s/ Brian R. Martinotti*
**BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**